**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

PATRICK J. GORNEY,

        *Plaintiff*,

*v*.

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

CIVIL ACTION NO. 2:17-cv-13814

DISTRICT JUDGE DAVID M. LAWSON

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S OPINION AND ORDER ON PLAINTIFF'S MOTION FOR REMAND PURSUANT TO SENTENCES FOUR AND SIX AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Docs. 11, 12)

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Remand Pursuant to Sentences Four and Six, (Doc. 11), be **DENIED**, the Commissioner's Motion, (Doc. 12), be **GRANTED**, and this case be **AFFIRMED**.

## II. REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Patrick J. Gorney's claim for Supplemental Security Income ("SSI") benefits under Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 1). Pursuant to

1

28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (Doc. 3). Currently before the Court is Plaintiff's Motion seeking remand pursuant to Sentence Four and Sentence Six, (Doc. 11), and Defendant's motion for summary judgment, (Doc. 12). Plaintiff has also filed a response to Defendant's motion. (Doc. 13).

Plaintiff filed three previous SSI applications—in 2006, 2010, and 2012—all of which were denied at the initial level and none of which Plaintiff appealed. (PageID.128). Then, on May 8, 2014, Plaintiff filed an SSI application alleging disability beginning December 13, 2010. (PageID.213-218). After the Commissioner initially denied his claim, Plaintiff requested an administrative hearing, which was held before Administrative Law Judge ("ALJ") Sean McKee on November 8, 2016. (PageID.90-125). Ultimately, the ALJ found that Plaintiff had not been under a disability between the date the application was filed, May 8, 2014, and the date of the decision, December 14, 2016. (PageID.69-89). The Appeals Council denied Plaintiff's request for review. (PageID.25-31). This action followed.

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

3

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir.

2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff not disabled. (PageID.69-89). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of May 8, 2014. (PageID.74). At step two, the ALJ concluded that the following impairments qualified as severe: degenerative disc disease, arthritis, migraines, chronic obstructive pulmonary disease ("COPD"), bladder cancer, major depressive disorder, and anxiety disorder. (*Id.*). Plaintiff also had several non-severe impairments: mild left carpal tunnel disease, gastroesophageal reflux disease, and a myocardial infarction in June 2016. (*Id.*). The ALJ determined that Plaintiff's alleged nerve damage and "circulation problems" were not medically determinable impairments, however, because he had not been diagnosed with any nerve damage or circulation problems, and the record did not support his allegations. (*Id.*). Moving on, the ALJ also decided that none of Plaintiff's impairments met or functionally equaled a listed impairment at step three. (PageID.74-76). Next, the ALJ determined that Plaintiff had the RFC to

> perform sedentary work as defined in 20 CFR 416.967(a) except he can occasionally climb ramps and stairs. He can never climb ladders, ropes, or scaffolds. The claimant can frequently use bilateral hand and foot controls. He can frequently handle, finger, and feel with his bilateral upper extremities. He can frequently balance on level surfaces. The claimant can occasionally

stoop, kneel, crouch, and crawl. He can occasionally tolerate exposure to extreme cold and wetness. He can frequently tolerate exposure to pulmonary irritants such as dusts, odors, and fumes. He can never tolerate exposure to workplace hazards such as unprotected heights and moving mechanical parts. The claimant should avoid work outdoors in bright sunshine or with bright or flickering lights such as would be experienced in welding or cutting materials. He can perform simple, routine tasks, but not at a production rate pace such as assembly line work. He can occasionally interact with supervisors and coworkers and never interact with the general public.

(PageID.76-77).

At step four, the ALJ found that the Plaintiff had no past relevant work. (PageID.82). Finally, at step five, the ALJ determined that considering Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform. (PageID.83).

### E. Administrative Record

#### 1. Medical Evidence

The Court has reviewed Plaintiff's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

##### i. Plaintiff's Function Report

Plaintiff completed a function report on July 2, 2014. (PageID.252). He stated his ability to work was limited because he was "in pain all the time," his back prevented him from doing "most anything," he had nerve damage ("Hands don't wanna work[.]"), and his legs "[did not] work right most of the time," causing him trouble walking. (PageID.245). He also found it hard to turn his neck and suffered from migraines and double vision. (*Id.*).

Asked to select from a list which activities were affected by his illnesses, injuries, or conditions, Plaintiff marked all except "talking." (PageID.250). His back and legs affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs. (*Id.*). He was "[n]ot supposed to lift anything over 15 [pounds.]" (*Id.*). Plaintiff estimated he could walk a block or two before needing to rest for about five minutes. (*Id.*). His ability to use his hands was impaired by "broken bones, fingers." (*Id.*). He needed a hearing aid and glasses for hearing and seeing, respectively. (*Id.*). Additionally, he had difficulty getting along with others because he became "upset and angry easy" and "defensive." (*Id.*). His "PTSD/OCD" affected his ability to complete tasks, he had "almost no[]" concentration, and indicated he was often confused next to the check boxes for his ability to follow instructions and to understand. (*Id.*). He "forg[o]t a lot." (*Id.*). Plaintiff estimated he could pay attention for a "couple minutes or less," and needed additional explanation when trying to follow written instructions. (*Id.*). Verbal instructions he followed "[a] little better." (*Id.*).

In an average day, Plaintiff would watch television, go for short walks, and talk to his girlfriend "a lot." (PageID.246). Previously, he had been able to work forty-hour weeks at "hard jobs" and had been "a lot more active." (*Id.*). Now, his illnesses, injuries, or conditions troubled his sleep and made personal care difficult. He explained that he often woke up in pain or felt too restless to sleep. (*Id.*).

He took care of a pet dog, including feeding it and letting it out; his girlfriend took care of the dog when he could not. (PageID.246). When it came to personal care, he explained that his ability to dress was impaired because he needed to sit down "most of the

7

time"; likewise, it "hurt[] to stand too long" in the shower. (*Id.*). Most of the time, he was able to care for his hair as usual, but sometimes he had "trouble" with his hands, arms, or neck. (*Id.*). When shaving, he cut himself "a lot from hands shaking" due to "arthritis, etc." (*Id.*). His anxiety and depression diminished his appetite. (*Id.*). Using the toilet was "painful[] most times" because he found it "hard to move up and down to go." (*Id.*). His girlfriend reminded him to take his pills every day and to tend to his hygiene when he was depressed. (PageID.247).

Plaintiff stated that he prepared his own meals—"frozen microwave stuff, lots of sandwiches, quick easy stuff"—weekly, in about ten to fifteen minutes. (*Id.*). Previously, he "used to cook meals all the time." (*Id.*). His girlfriend did all the chores around the house because he was in pain "most of the time." (*Id.*).

Plaintiff went outside a "couple of times a day" so he would not feel claustrophobic, and walked when he could. (PageID.248). He had a driver's license but did not drive because he had no vehicle. (*Id.*). He shopped for food for two to three hours "maybe once a month," pushing a cart so he could walk more easily; his girlfriend did most of the shopping. (*Id.*).

He indicated that he could not pay bills, count change, handle a savings account, or use a checkbook or money orders. (*Id.*). By way of explanation, he wrote: "Frustrates me – body prevents me, upsetting when I can't – people don't listen – they think I'm too young or lying – not true." (*Id.*). Further, he marked his ability to handle money had changed since onset, adding: "I hate miscounting, [it's] frustrating." (PageID.249).

8

As for hobbies, he watched television "all the time" to distract from the pain, enjoying programs such as NASCAR, motorcycle races, and car shows. (*Id.*). Since onset, however, he "[kept] having blurred and double vision" and "bad migraines," and completed that his vision was "getting worse." (*Id.*).

Plaintiff did not get along with most people, and described himself as a "homebody" since he did not "trust people that much anymore." (PageID.250). He spent time with his girlfriend every day but did not trust other people" (PageID.249). He did not go anywhere on a regular basis besides doctor's appointments or shopping, to which his girlfriend took him. (*Id.*).

Plaintiff also did not get along well with authority figures because he felt as though he "had to be defensive"; he had not, however, ever been fired or laid off from a job because of problems getting along with other people. (PageID.251). Asked how he well he handled stress, he replied, "I don't." He also indicated he did not like changes in routine. (*Id.).*

Plaintiff marked that he was "supposed to" use a cane and needed to procure a hearing aid and glasses or contacts. (PageID.251). He added a notation that he "need[ed] one" brace or splint for his right knee. (*Id.*). He stated that because all his medication had side effects, he was "[n]ot sure which ones are causing side effects," without naming any specific effects from which he suffered. (PageID.252).

In closing, he added: "I have a lot of anxiety-depression and mental issues due to my health and body issues, always in a lot of pain with my back-neck-arms and legs-knees and hands[.] It affects my eyes and hearing problems, memory problems and get confused a lot because of it . . . . I've needed help for a long time and it's hard to get anyone to listen.

9

Neck is a lot worse and lower back too, makes most everything else worse! Have to go for

M.R.I. X-Rays and supposed to see Neurosurgeon for surgery." (*Id.*).

### ii.        Third Party Function Report

Plaintiff's ex-wife and current girlfriend, Jamie Slater, also completed a function report on July 2, 2014. (PageID.255). She and Plaintiff had known each other for twenty-six years, and lived together at the time she completed the form. (*Id.*).

Slater stated that Plaintiff was always in pain, and was limited in his ability to work by his back and the fact that "his legs [didn't] always work," which made walking difficult. (*Id.*). His daily routine varied depending on how he felt; he might sit on the couch and watch television, or if he was feeling good, he might go for a short walk. (PageID.256). Plaintiff took care of the dog, gave her water, and took her outside. (*Id.*). When he had "a hard time moving," however, Slater took care of the dog instead. (*Id.*). For his hobbies, Plaintiff "just watche[d] television all the time," though he had "a problem with his eye sight getting [blurred]." (PageID.259).

Before Plaintiff's illnesses, injuries, or conditions, he had been able to work more than forty hours a week in "lots of hard jobs," such as roofing, construction, cooking, and mowing grass. (PageID.256). He had been able, too, to cook "all kinds of meals"; he now prepared sandwiches or microwave meals weekly, taking up to half an hour to do so. (PageID.257). Slater did all the household chores because Plaintiff was "[always] weak and in pain." (PageID.257-258). His illnesses, injuries, or conditions also affected his sleep—he could not get comfortable and would be "up and down all night." (PageID.256).

As for personal care, Slater largely repeated Plaintiff's reports that he had difficulty standing to dress and shower, his hand shook while shaving and he cut himself, he had no appetite when depressed, and getting up and down to use the toilet was challenging. (*Id.*). Slater reminded him to take care of his personal hygiene and when to take his medicine. (PageID.257).

Slater estimated that Plaintiff went outside two or three times every day, either walking or riding in a car. (PageID.258). Slater indicated that Plaintiff could go out alone, (*id.*), though she later marked that he needed someone to accompany him, (PageID.259). He had his driver's license but did not drive. (PageID.258.). Slater did most of the shopping; Plaintiff shopped for food about once a month, for two hours, and pushed the cart to help him walk. (*Id.*). In general, Plaintiff and Slater did not go anywhere except grocery shopping or to doctor's appointments. (PageID.259). Plaintiff did not get along with many people and tended to keep to himself. (PageID.260).

Slater also marked that Plaintiff was unable to pay bills, count change, handle a savings account, and use a checkbook or money orders, explaining that Plaintiff became frustrated and upset when he attempted to handle money. (PageID.258-259).

Asked to check off which abilities were affected by Plaintiff's illnesses, injuries, or conditions, Slater also marked every ability except talking: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using hands, and getting along with others. (PageID.260). She provided the same explanations as Plaintiff,

and echoed his estimates of how long he could walk and pay attention. *Compare* (*id.*), *with* (PageID.250).

Plaintiff did not get along well with authority figures, according to Slater, though she corroborated that he had never been fired or laid off from a job because of problems getting along with other people. (PageID.261). She remarked that he did not handle stress or changes in routine well "at all," and was "scared of a lot of stuff." (*Id.*).

As Plaintiff had, Slater indicated he was "suppose[d] to" use a cane and "need[ed]" a brace or splint for his knee, had lost his hearing aid, and needed to get glasses or contact lenses. (*Id.*). And like Plaintiff, Slater reported that all of his medications had side effects and she was not sure which was causing "his side [effects]," without indicating from what side effects was suffering. (PageID.262).

In conclusion, Slater said, "Patrick has a lot of pain and mental problems and depression and [anxiety] along with his knees, hands, back, eyes, hearing, [and] memory, and he is [always] confused." (*Id.*) (punctuation altered from original for clarity).

### iii.  Plaintiff's Testimony at the Hearing

An administrative hearing was held in Plaintiff's case on November 8, 2016, before ALJ Sean McKee. (PageID.90-125). Plaintiff was forty-six years old at the time of the hearing. (PageID.98). He had dropped out of school in tenth grade, but later earned his GED and "a couple . . . vocational certificates here and there." (*Id.*). He stood 6'4" and weighed between 180 and 200 pounds. (PageID.99).

Plaintiff testified that he could not work due to his health—specifically, his back, neck, heart, and bladder cancer. (PageID.100-101). "Everything's hitting me all at once the

past couple of years," he said. "It's been a whirlwind. It's hard to even focus sometimes." (PageID.101). He suffered from back pain that ran from his tailbone up to the base of his skull, and affected his ability to walk "all the time." (PageID.110). His walking was also troubled from when he had broken his right leg and from ankle issues "on and off all [his] life." (*Id.*). His physician had prohibited him from lifting more than five pounds. (PageID.105). His affective disorders interfered with his ability to work by causing memory loss or making him "fog out." (PageID.101). Plaintiff also had "circulation issues" and "some nerve damage in his hands and wrist" that sometimes caused numbness, as well as numbness in his feet. (PageID.109, 111).

Further, at the time of the hearing, Plaintiff had been through six rounds of chemotherapy for bladder cancer, although his final round had been postponed after he had a heart attack. (PageID.102). He was currently "waiting for one final outpatient biopsy . . . to find out if it worked." (*Id.*). His condition caused him to be "constantly up and down . . . with passing urine"; though since receiving chemotherapy it had "gotten somewhat better," Plaintiff said he could still be in the restroom for twenty minutes to an hour. Asked again later, however, he said he might spend "thirty seconds to two minutes" in the bathroom, an average of "two to ten, twelve times a day," while "a daily bowel movement" could sometimes take half an hour. (PageID.108). He also experienced urgency at times. (*Id.*).

He went to see Dr. Lie "once every couple of months or so" for any medication adjustments; he estimated he was taking "between five and maybe twelve, thirteen" medications. (PageID.103). Some of his medications caused side effects "here and there":

"Sometimes sleeplessness, sometimes it'll mess with my diet a little bit but I know if I don't eat[,] because of my . . . very low blood sugar, it messes with everything else. Sometimes it messes with my vision, it messes with my hearing." (*Id.*). Asked to explain further, he elaborated that he sometimes saw "spots and fog." (*Id.*).

He also complained that when he had a bad day and was "all swelled up or with the arthritis and that," his "spine issues" caused numbness in his arms and legs and would "mess with the vision and the hearing, all my faculties." (PageID.103-104). Additionally, his ability to concentrate was "not great." (PageID.104). He explained that the day of the hearing was "one of [his] worse days" due to "trying to focus and function" through pain. (PageID.104).

It was "very rare" that he could sleep through the night, perhaps once or twice a week. (PageID.111). The rest of the time he would "toss and turn all night long," which he affirmed affected his concentration during the day. (*Id.*). He estimated he took naps varying in length from ten minutes to two hours about four or five days a week, and he sometimes would "just nod off" without realizing. (*Id.*). He also described difficulty concentrating as a side effect of his medications and due to his "anxiety and stress with the health issues." (PageID.111-112). At times he would not be able to watch an hour-and-a-half long movie because he would "zone out" or have to get up and move. (PageID.112). Asked whether he had days when pain prevented him from getting out of bed, Plaintiff said yes, "[t]wo, five times a month, sometimes more than that . . . with the bladder thing." (*Id.*). It was "[v]ery rare" that he was able to help out around the house. (PageID.115). He could sometimes make sandwiches or "a small pot of something." (*Id.*).

14

Additionally, Plaintiff had recently been referred to a neurologist at least in part because he repeatedly had "bad headaches and severe migraines," "[a]verage five, ten times; sometimes more, sometimes less in a month." (PageID.113). They caused light sensitivity and sometimes also disturbed his vision, forcing him to close his eyes, sit down, or lie down. (PageID.113-114). His physician had also recommended he see a therapist, but he had not "had a chance to" with his physical issues. (PageID.116).

Moving on, Plaintiff testified he "tr[ied] to get along with everybody," but usually kept to himself. (PageID.114). He felt anxious "on and off" when out in public, and did not like crowds or "big places." (PageID.114). He explained that he had "anxiety and stress issues" and "trust issues" and had been "incarcerated on and off through my life since I was young." (PageID.115). He did not "like to be enclosed around a bunch of people." (*Id.*).

The ALJ asked Plaintiff for clarification on a note dated May 31, 2016, that Plaintiff exercised at least twenty minutes a day, one to two days per week. (PageID.105) (referring to PageID.615). Plaintiff stated that was no longer the case, and on May 31 had been "vaguely" true, "on and off," but that that had been before his heart attack and cancer treatment.[1] (PageID.106).

---

[1] The record indicates that by the time of the report in question, Plaintiff had received four Bacillus Calmette-Guerin ("BCG") treatments for bladder cancer. (PageID.537, 539, 541, 543, 615).

Lastly, the ALJ asked Plaintiff about a medical note from June 6, 2016, that referenced "alcohol abuse." (PageID.107). To the contrary, Plaintiff testified, he drank a "[c]ouple of beers once in a blue moon, maybe two, three times a year." (*Id.*).

### iv.  The Vocational Expert's Testimony at the Hearing

Vocational Expert ("VE") Kenneth Browde also testified at the hearing. (PageID.116) (testimony); (PageID.283) (correct spelling of name). The ALJ advised the VE that there was no past relevant work, and then presented his first hypothetical:

> [A]ssume an individual of the claimant's age, education and work experience who's able to perform sedentary exertion work activities as defined in the regulations with the following limitations.
>
> This individual can occasionally climb ramps and stairs[;] . . .  never climb ladders, ropes and scaffolds[;] . . . frequently use bilateral hand and foot controls[;] . . . frequently handle, finger and feel with his bilateral upper extremities[; and] . . . frequently balance on level surfaces. This individual can occasionally stoop, kneel, crouch, and crawl.
>
> This individual should avoid work outdoors in bright sunshine or with bright or flickering lights such as would be experienced in welding or cutting materials. This individual can perform simple routine tasks but not at a production rate pace such as assembly line work. This individual can occasionally interact with supervisors and coworkers, and never interact with the general public.

(PageID.117-118).

The VE testified that the hypothetical person could perform work in the national economy including bench inspector ("at least" 14,000 jobs nationally), office clerk (50,000 jobs nationally), and surveillance system monitor (24,000 jobs nationally). (PageID.119). As neither the Dictionary of Occupational Titles nor its companion title, the Selected Characteristics of Occupations, addressed contact with the public, the VE had reduced the

number of office clerk jobs available nationally based on his "admittedly anecdotal observations of this job in the real world" over the course of his more than thirty years as a vocational professional. (PageID.120).

Moving on, the ALJ posed his second hypothetical, which was identical to the first except that in addition to normal breaks the individual would be off-task for 20 percent of the workday. (PageID.120). The VE replied that in his professional judgment, no jobs would be available for an employee off-task more than ten percent of the workday. (PageID.120-121).

In answer to questions from Plaintiff's counsel, the VE elaborated that employers would not tolerate more than one absence per month, regardless of reason. (PageID.121). The VE stated that he could not, however, speak to the extent to which an employer might tolerate absences for scheduled medical treatment, as that was workplace-specific. (*Id.*). Additionally, he testified that his answers to the ALJ's hypotheticals would remain unchanged for an individual who needed to shift positions at will. (PageID.122). Lastly, Plaintiff's counsel asked whether an employer would "tolerate an employee lying down at unpredictable intervals"; the VE answered no, according to his vocational judgment. (PageID.123).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified

psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

18

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the person's RFC, or the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

19

The claimant must provide evidence establishing his RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he can still do despite his limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The RFC "is the most he can still do despite his limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

G.    **Analysis**

1. **Substantial Evidence Supports the Commissioner's Determination, and Remand Under Sentence Four is Not Warranted.**

i.    **Plaintiff's Bladder Cancer Diagnosis and Treatment**

As an initial matter, Plaintiff complains the ALJ gave "virtually no consideration . . . to the impact of the diagnosis of bladder cancer and subsequent treatment." (Doc. 11 at PageID.722). But Defendant is quite correct that the diagnosis of a condition, in and of itself, says nothing about the severity of the condition or what limitations it will impose on Plaintiff, let alone whether those limitations are disabling. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of [a condition], of course, says nothing about the severity of the condition."); *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) ("[N]ot every diagnosable impairment is necessarily disabling.").

Besides, the ALJ reviewed Plaintiff's medical records at length, (PageID.78-82); he specifically noted that Plaintiff had been diagnosed with bladder cancer in November 2015,

undergone a cystoscopy in January 2016 that confirmed the presence of malignant cells, and undergone Bacillus Calmette-Guerin ("BCG") therapy for treatment. (PageID.79). Moreover, the ALJ observed that Plaintiff had "recently finished chemotherapy for bladder cancer" and "testified that he had intermittent urgency and difficulty using the restroom due to the bladder cancer and effects of treatment." (PageID.77). The ALJ then explicitly accounted for Plaintiff's bladder cancer and the effects of treatment by limiting Plaintiff's exertional level to sedentary. (PageID.80). Finally, the ALJ noted that at the time of his opinion, Plaintiff was "still waiting to find out whether he still has cancer." (PageID.79).

Plaintiff also avers that the ALJ's limitation to simple and routine tasks "failed to address the impact of the diagnosis, symptoms and treatment upon Plaintiff's ability to sustain concentration and attendance." (Doc. 11 at PageID.723). But the ALJ is required to incorporate in his RFC assessment only those limitations he accepts as credible. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). And since Plaintiff is challenging the RFC assessment, the burden to prove the existence of additional limitations rests with him. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999). Unfortunately, Plaintiff does not provide any citations to record evidence, even his own testimony, in support of his contention that his RFC did not sufficiently account for his alleged difficulties sustaining concentration and attendance.

Regardless, the ALJ acknowledged Plaintiff's argument—which he also alludes to in his brief here—that his cancer treatment caused "debilitating fatigue" that "would clearly have resulted in a work-preclusive level of absenteeism." (Doc. 11 at PageID.724); (Doc. 13 at PageID.762-763); (PageID.79). But as the ALJ noted, "there is no evidence that the

claimant was experiencing significant fatigue or that it would persist for at least twelve months." (PageID.79). Plaintiff's first BCG treatment for his bladder cancer was administered on February 2, 2016. (PageID.537). As far as the undersigned can tell, since Plaintiff began his BCG treatment, he reported fatigue on only one occasion: at his third BCG treatment, on February 23, 2016. (PageID.541). Even prior to his diagnosis of cancer and the beginning of treatment, he reported fatigue only once, in February 5, 2015, shortly after a hospitalization for nausea and vomiting due to gastritis. (PageID.440). Although Plaintiff testified at the administrative hearing that he had difficulty sleeping and needed frequent naps, the ALJ noted that Plaintiff made "many inconsistent statements regarding both his physical and mental impairments." (PageID.79-80). Plaintiff's motion does not challenge the ALJ's credibility finding.[2]

For all the foregoing reasons, I suggest the ALJ adequately accounted for Plaintiff's bladder cancer and treatment in his RFC.

### ii.   Treating Source Rule

Next, I mark that Plaintiff references the treating source rule in several places, though an argument never fully manifests. He makes a throwaway mention of SSR 96-2p,

---

[2] Plaintiff raises an argument about his credibility for the first time in his response to Defendant's motion for summary judgment. (Doc. 13 at PageID.761). I note that Plaintiff argues in part his testimony was corroborated by Dr. Kaffenberger's note, (Doc. 13 at PageID.761), which was not before the ALJ and this Court cannot consider in determining whether a Sentence Four remand is appropriate. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Regardless, the Sixth Circuit "has consistently held that arguments not raised in a party's opening brief . . . are waived." *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). Thus, I suggest Plaintiff has waived this challenge.

(Doc. 11 at PageID.722), a ruling that explains when a treating source opinion is due controlling weight. SSR 96-2p. Some pages later, Plaintiff apparently completes the thought: "It should be recalled that the ALJ accorded little weight to the opinion of Plaintiff's treating physician, Dr. Lie." (Doc. 11 at PageID.724). The ALJ's disregard of Dr. Lie's opinion, Plaintiff argues, "represents an error inextricably leading to the ALJ's crafting and reliance upon a defective RFC." (Doc. 11 at PageID.724).

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

Plaintiff makes no argument that Dr. Lie's opinion was well-supported by medically acceptable clinical and laboratory diagnostic techniques, or that it was not inconsistent with other substantial evidence in the record. In fact, the ALJ explained that he assigned little weight to most of Dr. Lie's opinion because it was inconsistent with the evidence as a whole. (PageID.80). Specifically, he noted that from late 2013 to May 2015, Plaintiff reported he was able to milk a cow, do metalwork, and fix his car, (PageID.80) (citing PageID.327, 403, 461), which was inconsistent with Dr. Lie's opinion that Plaintiff could only sit or stand for fifteen minutes at a time or walk the length of one city block. (PageID.658-659). And though she opined he could only perform repetitive activities with

23

either hand or arm for fifty percent of the workday, (PageID.660), a 2014 MRI of Plaintiff's cervical spine showed "only mild disc disease" and "[r]ather mild neural foraminal narrowing,"[3] and a 2014 EMG showed mild findings with no permanent nerve damage. (PageID.80) (citing PageID.364, 420, 468). The ALJ also observed inconsistencies between Dr. Lie's opinion and those of Dr. Sriharan, Dr. Morkos, and consultative examiners. (PageID.80). In sum, the ALJ provided good reasons not to assign more weight to Dr. Lie's opinion, and Plaintiff did not meaningfully contest those reasons. I suggest the ALJ's treatment of Dr. Lie's opinion was proper and is not grounds for remand.

### iii.   Psychological Consultations Performed Prior to Bladder Cancer Diagnosis

Plaintiff observes that "[t]he psychological evaluations granted a weight by the ALJ occurred prior to the diagnosis" of bladder cancer. (Doc. 11 at PageID.723). Plaintiff implies the bladder cancer diagnosis and treatment have affected his mental health, imploring the court to imagine "the body blow of a cancer diagnosis superimposed upon an individual already struggling with issues of depression, anxiety[,] and functionality," and to "please consider what [Plaintiff's] level of functionality would have been thereafter." (Doc. 11 at PageID.724). Plaintiff never suggests the ALJ should have ordered updated consultative examinations, nor is there any evidence in the record that he made such a request to the ALJ. Rather, Plaintiff seems to be asking the Court to reweigh the evidence. That the Court may not do. *E.g.*, *Albanna v. Comm'r of Soc. Sec.*, No 15-14264,

---

[3] The ALJ described the MRI as "normal," which comports with Dr. Sriharan's description of the results as "really unremarkable." (PageID.377). Plaintiff does not object to this characterization of the evidence.

2016 WL 7238925, at *1, *12 (E.D. Mich. Nov. 22, 2016) ("Arguments which in actuality require 'reweigh[ing] record evidence' beseech district courts to perform a forbidden ritual.") (quoting *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)).

### iv.    Plaintiff's June 2016 Myocardial Infarction

Lastly, I note that in his response to Defendant's motion, Plaintiff raises for the first time the suggestion that "[w]hile the occurrence of the heart attack is acknowledged in . . . the ALJ's decision, the ramifications of the event are largely ignored." (Doc. 13 at PageID.760). What those ramifications may be, Plaintiff has unfortunately left to the Court's imagination. As the ALJ noted, a left heart catheterization after Plaintiff's myocardial infarction in June 2016 demonstrated normal coronary arteries, and Plaintiff has not consulted or treated with a cardiologist since. (PageID.74). And regardless, the Sixth Circuit "has consistently held that arguments not raised in a party's opening brief . . . are waived." *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013); *see also United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) (""Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones."). Thus, I suggest Plaintiff has waived this argument.

I suggest substantial evidence supports the Commissioner's determination, and Plaintiff has presented insufficient justification for a Sentence Four remand.

## 2. Plaintiff Fails to Present Material Evidence Warranting a Sentence Six Remand.

Plaintiff also moves for a Sentence Six remand so the ALJ may "fully appreciate the nature of Plaintiff's treatment, the frequency thereof and Plaintiff's current progress." (Doc. 11 at PageID.724-726). Plaintiff's brief addresses only a piece of correspondence from Plaintiff's treating oncologist Dr. Samuel Kaffenberger dated August 2017. (*Id.*) (citing Doc. 11 at PageID.729-30). The record contains additional post-hearing evidence not mentioned in Plaintiff's brief: the results of Plaintiff's June 2017 bladder biopsy, (PageID.34-35), a record of his May 2017 cystoscopy, (PageID.36-43), and an April 2017 letter from Dr. Kaffenberger to Dr. Lie regarding Plaintiff's planned course of treatment for bladder cancer, (PageID.44-50), and an April 2017 pathology report from the University of Michigan, (PageID.57-58).[4]

Remand under Sentence Six is not appropriate unless the claimant shows: (1) "the evidence at issue is both 'new' and 'material,'" and (2) "there is 'good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Hollon ex. rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)). Evidence is new only if "it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)). It is material only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of

---

[4] Plaintiff also submitted to the Appeals Council a copy of a January 2015 brain MRI, (PageID.52-53), but it appears that report was already a part of the record, (PageID.483-484), and so it is not "new" evidence.

the disability claim if presented with the new evidence.'" *Id.* (quoting *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)). And a claimant shows good cause by "demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* (citing *Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (1984) (per curiam)). "It is well established that the party seeking remand bears the burden of showing that a remand is proper under Section 405." *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).

The author of the August 2017 letter, Dr. Kaffenberger, began consulting on Plaintiff's bladder cancer treatment in April 2017. (Doc.11 at PageID.729). In his letter, Dr. Kaffenberger relates the history of Plaintiff's diagnosis of and treatment for bladder cancer, some of which is duplicative of the administrative record. (*Id.*). The remainder details how in February 2017, a bladder biopsy was consistent with "non muscle invasive bladder cancer"; a repeat biopsy in May 2017 revealed no presence of bladder cancer, though urine cytology was positive for malignant cells. (Doc. 11 at PageID.729). Dr. Kaffenberger requested a CT urogram, "which was delayed for some time by" Plaintiff, and ultimately proved negative for "concerning lesions." (*Id.*). In the end, Plaintiff "elected to undergo repeat BCG therapy." (*Id.*). A repeat ctylogy test prior to beginning BCG therapy was normal. (*Id.*).

At the time Dr. Kaffenberger penned his correspondence, Plaintiff had completed all but two remaining treatments, both of which were scheduled for August 2017. (Doc. 11 at PageID.730). He would then undergo lab evaluation to see if the treatment had been effective, and potentially BCG maintenance treatments. (*Id.*). Dr. Kaffenberger describes

the maintenance protocol as "a rather grueling regimen," with possible side effects of law grade fevers and irritative voiding symptoms that would typically resolve in 48 hours. (*Id.*). The physician anticipated a "good response" to treatment and described Plaintiff's prognosis as good. (*Id.*).

Defendant does not contest that Dr. Kaffenberger's letter satisfies the newness and good cause requirements, as he began treating Plaintiff four months after the ALJ's decision. (Doc. 12 at PageID.754). Defendant contends, however, that for the same reason Plaintiff cannot show that the evidence is material—in other words, that there is not "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). I must agree. Dr. Kaffenberger's letter says nothing about Plaintiff's limitations prior to the ALJ's decision, the relevant time period. In fact, though the letter mentions *possible* side effects, it does not indicate that Plaintiff suffered from any during his treatments, pre- or post-hearing; nor does it purport to place any functional limitations on Plaintiff.

The same is true for the other new evidence. For example, in Dr. Kaffenberger's April 2017 letter to Dr. Lie, he related that Plaintiff was reporting "significant local pain related to the bladder cancer" and poor bladder function, in addition to his systemic complaints of back and musculoskeletal pains. (PageID.44). The letter did not suggest, however, that Plaintiff had been suffering from those complaints during the time period under consideration, May 2014 to December 2016. And "[e]vidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial."

*Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992); *see also*

*Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988) ("If in fact

the claimant's condition had seriously degenerated, the appropriate remedy would have

been to initiate a new claim for benefits as of the date that the condition aggravated to the

point of constituting a disabling impairment.").

For those reasons and the others explained above, I suggest this evidence is not

material, and a Sentence Six remand is not warranted.

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion

for Remand Pursuant to Sentences Four and Six, (Doc. 11), be **DENIED**, the

Commissioner's Motion, (Doc. 12), be **GRANTED**, and this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14

days after being served with a copy of the recommended disposition, a party may serve and

file specific written objections to the proposed findings and recommendations. A party may

respond to another party's objections within 14 days after being served with a copy." Fed.

R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections

constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985);

*Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States*

*v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some

objections, but failing to raise others, will not preserve all the objections a party may have

to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d

390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  September 12, 2018               S/ PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge


**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: September 12, 2018               By s/Kristen Castaneda
                                       Case Manager

30